Receipt number AUSFCC-10683138

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MBA MORTGAGE CORPORATION,<br>         Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>         Defendant. | )<br>)<br>)     Case No.  **25-1433 T**<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT

MBA Mortgage Corporation ("Plaintiff") files this Complaint against the United States of America ("Defendant") for a refund of the Employee Retention Credit for the third quarter of 2021, and alleges as follows:

### THE PARTIES

1.  MBA Mortgage Corporation is a Massachusetts corporation with its principal place of business at 2 Adams Place, Quincy, Massachusetts 02169.

2.  The United States of America is the proper defendant because this Complaint seeks refund of taxes paid to (and refundable credits owed from) the Internal Revenue Service ("IRS"), a political subdivision of the United States.

3.  The Plaintiff has not initiated any other lawsuits in state or federal court dealing with the same or similar facts as this action.

4.  A statement required under R.C.F.C. 9(m)(2)(B) is attached as **Exhibit A**.

### JURISDICTION

5.  This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1491.

### LEGAL BACKGROUND

#### Federal Employment Taxes

6.  Plaintiff is claiming a refund of Form 941 employment taxes ("Form 941 taxes") and the refundable Employee Retention Credit ("ERC").

7.  Employers are required by law to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from their employees' wages, remit these

withholdings, and report them to the IRS on tax Form 941. The portion of Form 941 taxes attributable to the employees' withholdings is often referred to as the "Trust Fund" portion.

8. Employers are also responsible for paying FICA taxes that they owe, often referred to as the "employer portion," and reporting such taxes to the IRS on Form 941. 26 U.S.C §§ 3102 and 3111.

9. Employers are usually obligated to file with the IRS the Form 941 quarterly. 26 U.S.C § 6011; 26 C.F.R. § 31.6071 (a)-1.

### Employee Retention Credit

10. In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. 116-136 (Mar. 27, 2020). Section 2301 of the CARES Act provided for the ERC to be issued to eligible employers on qualified wages paid to their employees. Pub. L. 116-136, § 2301. The ERC program was amended and extended under the Consolidated Appropriations Act of 2021, Pub. L. 116-260, § 206 (Dec. 27, 2020), and the American Rescue Plan Act of 2021, Pub. L. 117-2, § 3134 (Mar. 11, 2021), and terminated under the Infrastructure, Investment and Jobs Act, Pub. L. 117-58, § 80604, (Nov. 15, 2021). *See also* 26 U.S.C. § 3134 (codifying section 2301 of the CARES Act).

11. A business that is an eligible employer that pays qualified wages after March 12, 2020, and through December 31, 2021, is entitled to claim the ERC against its Form 941 taxes on the applicable Form 941 return for that quarter.

12. Under section 2301(b)(3) of the CARES Act, if the amount of the credit exceeds the amount of Form 941 taxes for any applicable quarter, then the excess is treated as an overpayment and refunded to the employer. *See* 26 U.S.C. § 3134(b)(3).

### General Qualifying Requirements

*Employer Eligibility*

13. An eligible employer is one that carried on a trade or business during calendar years 2020 and 2021 and, with respect to any calendar quarter for which the business experienced one of the following:

   a. Its operations were fully or partially suspended due to orders issued by a governing authority in response to COVID-19 ("Full or Partial Suspension Test") that limited commerce, travel, or group meetings; or
   b. The business experienced a significant decline in gross receipts ("Gross Receipts

Test") for any calendar quarter of 2020 and/or the first three quarters of 2021[1] compared to the corresponding quarter of 2019.

26 U.S.C. § 3134(c)(2).

### *Qualified Wages*

14. For the purposes determining the ERC for quarters in 2020 and 2021, "qualified wages" includes only the wages paid to their employees (as defined by 26 U.S.C. § 3231(c)), but also expenses the employer paid to provide and maintain a group health plan (only to the extent that the amounts are excluded from the gross income of the employees). 26 U.S.C. §§ 3134(c)(3), (c)(5)(A), (c)(5)(B).

15. However, this term is subject to certain additional restrictions: to claim the credit for quarters in 2020, the employer must have averaged no more than 100 employees in 2019. To claim the credit for quarters in 2021, the employer must have averaged no more than 500 employees in 2019. 26 U.S.C. § 3134(c)(3).

### *Calculating the Credit*

16. For quarters in 2020, the employee retention credit is limited to fifty percent (50%) of qualified wages that an eligible employer pays to an employee in a calendar quarter. 26 U.S.C. § 3134(b)(1). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee for the entire calendar year of 2020. 26 U.S.C. § 3134(b)(1).

17. For quarters in 2021, the employee retention credit is limited to seventy percent (70%) of qualified wages that an eligible employer pays in a calendar quarter. 26 U.S.C. § 3431(a). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee *per quarter* in 2021. 26 U.S.C. § 3134(b)(1).

## FACTUAL BACKGROUND

18. Plaintiff operates a mortgage brokerage company serving clients throughout New England.

19. During the periods at issue, Bernard Barlow owned a 75% interest in Plaintiff and Matthew Scott owned a 25% interest in Plaintiff.

20. Plaintiff had on average less than 100 full-time employees during calendar year

---

[1] A business may be eligible to receive an ERC for the fourth quarter 2021 if it qualifies as a "recovery startup business." *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III). Plaintiff does not qualify as such and thus does not seek an ERC for this quarter.

2019.

21. Plaintiff paid qualified wages to its employees in calendar years 2020 and 2021.

22. Plaintiff is not a party to any employee leasing arrangement and did not otherwise lease employees.

23. Plaintiff is not a part of an affiliated service group within the meaning of 26 U.S.C. § 414(m).

## The Relevant Governmental Orders

24. Between March 12, 2020, and September 30, 2021, several binding orders issued by Massachusetts ("Relevant Governmental Orders"), significantly limited commerce in ways relevant to Plaintiff.

25. On March 10, 2020, Governor Charlie Baker declared a state of emergency and imposed broad restrictions on travel for state employees.

26. On March 23, 2020, Governor Baker issued a Shelter-At-Home Emergency, effective March 24, 2020, to April 7, 2020. Exhibit A to the order defined essential services, which were excluded from the shelter-in-place and closure requirements, as healthcare and human services, law enforcement, food and agriculture, public works and infrastructure including water, energy, information technology, hotels, critical manufacturing, financial services, and chemical sectors, among others.

27. On April 28, 2020, Governor Baker extended the essential services emergency order to May 18, 2020. This Order required all businesses and organizations that do not provide COVID-19 Essential Services to close their physical workplaces. Residents were strongly urged to stay home and avoid unnecessary travel and unnecessary person-to-person contact.

28. On May 1, 2020, Governor Baker ordered all residents to wear a face covering or mask in public places if maintaining proper social distancing measures was impossible. The order applied to all workers and customers of essential businesses that remained open to the public.

29. On May 8, 2020, Baker announced a four-phase reopening plan developed by the Reopening Advisory Board.

30. On May 19, 2020, Governor Baker issued COVID-19 Order No. 33, effective immediately. Consistent with the reopening plan, additional other businesses could reopen beginning on May 25, 2020, including businesses operating in office spaces. The order requires any business operating in Massachusetts to:

      a. Develop, train, and implement social distancing protocols;
      b. Perform regular cleaning and sanitizing;
      c. Provide signage indicating appropriate social distancing;
      d. Require face coverings for all employees;
      e. Regularly sanitize high-touch areas; and
      f. Clean and disinfect if an employee is diagnosed with COVID-19.

31. These newly reopened businesses also had to certify their compliance with the general requirements and any sector-specific rules enacted by the Director of Labor Standards, and post on their premises all public notices and advisories required under the order. Additionally, under this order, gatherings remained limited to ten people.

32. On December 26, 2020, Governor Baker issued Order No. 59, superseding the capacity limitations in Order No. 57, and Order No. 58 Under this order:

      a. Gatherings were limited to ten people indoors and twenty-five people outdoors;
      b. Restaurants were limited to 25% of their seating capacity;
      c. Indoor performance venues remained closed;
      d. Outdoor performance venues were limited to 25% capacity, but not more than twenty-five people;
      e. Theaters were limited to 25% capacity, but not more than 50 people; and
      f. Other businesses were limited to 25% of their capacities.

33. On January 11, 2020, Governor Baker issued Order No. 60, extending Order No. 59 until February 4, 2021.

34. On April 29, 2021, Governor Baker issued a revised order requiring all persons to wear face-coverings when in indoor public places and when attending events and gatherings in public locations. Face-coverings required in public outdoor places when unable to maintain six feet of distance, or as otherwise specified by Sector-Specific COVID-19 Safety Rules.

35. On June 15, 2021, Governor Baker ended the state of emergency and all remaining terminated emergency orders related to COVID-19.

**Plaintiff's Operations Were Impacted by The Relevant Governmental Orders**

36. The Relevant Governmental Orders had a more than nominal impact on Plaintiff's business operations through the disruption of its time-tested, traditional revenue-generating activities.

37. A large portion of Plaintiff's revenue was generated through in-person activities, such as meeting with clients or attending networking opportunities. Because of the Relevant Governmental Orders' restrictions on in-person work, networking opportunities, and industry

events, Plaintiff's ability to attract and retain clients suffered.

38. The restrictions imposed by the Relevant Governmental Orders affected a more than nominal portion of Plaintiff's business lines during the quarters eligible for the ERC. Thus, these facts and circumstances show that the Relevant Governmental Orders led to a partial suspension of enough of Plaintiff's business operations for the same quarters.

39. As a result of this partial suspension of its business operations, Plaintiff filed Forms 941-X claiming entitlement to ERCs based on qualified wages as follows:

| Quarter Ended | Qualified Wages | ERC (Excluding Interest) |
|---|---|---|
| June 30, 2020 | $201,205.32 | $100,602.66 |
| September 30, 2020 | $150,700.12 | $73,350.06 |
| December 31, 2020 | $111,792.70 | $55,896.35 |
| March 31, 2021 | $423,011.72 | $296,108.20 |
| June 30, 2021 | $449,941.47 | $314,959.03 |
| September 30, 2021 | $435,561.36 | $304,892.95 |
| **Total ERC Claimed (Excluding Interest)** | | **$1,147,809.25** |

40. When calculating its ERC, Plaintiff did not take into account qualified wages paid to any individuals who directly or indirectly owned a majority in Plaintiff, or qualified wages paid to any relatives of those individuals.

41. While Plaintiff applied for and had forgiven two loans under the Paycheck Protection Program ("PPP"), Plaintiff did not take into account wages covered by the forgiven PPP loans in calculating its qualified wages for the ERC.

42. Prior to this filing, the IRS issued to Plaintiff overpayments for the quarters ended June 30, 2020, through June 30, 2021.

### COUNT I: PLAINTIFF IS ENTITLED TO A REFUND FOR Q3 2021

43. On or before October 31, 2021, Plaintiff filed an original Form 941 for the employment tax quarter ended September 30, 2021 ("Q3 2021").

44. Plaintiff has no outstanding employment tax liability for Q3 2021.

45. Plaintiff paid qualifying wages of $435,561.36 in Q3 2021 and calculated an ERC of $304,892.95 for the quarter.

46. Prior to February 6, 2023, Plaintiff filed a Form 941-X for Q3 2021, claiming a refund of tax and ERC in the amount of $304,892.95 plus interest, with the IRS Service Center in Cincinnati, OH. Attached as **Exhibit B** is a true and correct copy of Plaintiff's filed Form 941-X for Q3 2021.

47. Plaintiff is a qualified employer eligible for an ERC for Q3 2021 under the Full or Partial Suspension Test because it paid qualified wages to employees and the Relevant Governmental Orders had more than a nominal impact on Plaintiff's operations, leading to a partial suspension of its business operations.

48. Plaintiff timely filed its Q3 2021 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

49. Thus, Plaintiff is entitled to a refund of $304,892.95 plus interest for Q3 2021.

WHEREFORE, Plaintiff prays that this Honorable Court:

A. Award judgment in favor of Plaintiff and against the United States in the amounts of:

   i. $304,892.95 plus interest for Plaintiff's Form 941 taxes/ERC credit for the employment tax quarter ended September 30, 2021; and

   ii. Any other interest, costs, and attorney's fees.

B. Grant any further relief this Court may find just and proper.

Dated: August 26, 2025.                    Respectfully Submitted,

                                           */s/ Christina Tallulah Lanier*
                                           CHRISTINA TALLULAH LANIER
                                           D.C. Bar No. 1779680

                                           *On Behalf Of*:

                                           BROTMAN LAW
                                           402 West Broadway, Suite 800
                                           San Diego, CA 92101
                                           Main Office: (619) 378-3138
                                           Facsimile: (619) 378-3039
                                           Email: tlanier@sambrotman.com